# In the United States Court of Federal Claims

No. 25-34C
(Filed Under Seal: April 1, 2025)
(Reissued: April 15, 2025)[1]

```
*************************************
                                    *
CULMEN INTERNATIONAL, LLC,          *
                                    *
                Plaintiff,          *
                                    *
        v.                          *
                                    *
THE UNITED STATES,                  *
                                    *
                Defendant,          *
                                    *
And                                 *
                                    *
TECHTRANS INTERNATIONAL, INC.,      *
                                    *
                Defendant-Intervenor.*
                                    *
*************************************
```

## OPINION AND ORDER

DAMICH, Senior Judge.

In this post-award bid protest, Plaintiff Culmen International, Inc. ("Culmen"), the incumbent contractor, challenges the technical, past performance, cost/price, and best value evaluations of the Agency for Request for Proposals No. HDTRA1-23-R-0018 ("Solicitation" or "Procurement"). The Solicitation is for the Department of Defense, Defense Threat Reduction Agency's ("Agency" or "DTRA") Threat Reduction Logistics Services ("TRLS") II Contract and is the follow-on effort to Culmen's TRLS I contract.

The Agency sought a contractor to provide logistics services across the Cooperative Threat Reduction ("CTR") Directorate, which includes the Cooperative Biological Threat Reduction Department, Proliferation Prevention Department, and the Integration Department. Culmen alleges that the DTRA's award of the TRLS II contract to TECHTRANS International, Inc. ("TTI") was arbitrary and irrational as TTI's scores should have been lower and that its

---

[1] The Court issued this opinion under seal on April 1, 2025, and the Court gave the parties fourteen days to propose the redaction of competition-sensitive, proprietary, confidential, or otherwise protected information. The parties filed their proposed redactions. Thus, the Court adopts the parties' redactions and issues the redacted opinion unsealed. Redactions are indicated with "[███████]."

scores should have been higher. Taking the alleged arbitrary and irrational decisions of the Agency together, Culmen believes it should have been awarded the TRLS II contract.

Culmen timely filed its Motion for Judgment on the Administrative Record on February 20, 2025, seeking a permanent injunction preventing the Agency from proceeding with the contract award and asks the Court to set aside the award. The Government and Intervenor timely filed their respective Responses and Cross-Motions for Judgment on the Administrative Record. The Motions are fully briefed, and oral argument is unnecessary.

For the reasons set forth below, the Court **GRANTS** the Government's and Intervenor's Cross-Motions for Judgment on the Administrative Record and **DENIES** Culmen's Motion for Judgment on the Administrative Record.

## I.      Statement of Facts

### A.  Background

The DTRA's core functions are to deter, prevent, and prevail against threats posed by weapons of mass destruction ("WMD"), including nuclear, chemical and biological threats.  *See* https://www.dtra.mil (last visited March 28, 2025).  As part of this mission, the agency responds to threats like the proliferation of such weapons from unstable areas such as Syria and biological disease outbreaks like Ebola in Africa.  *See* https://www.dtra.mil/About/DTRA-History (last visited March 28, 2025).  To support this mission, the current procurement sought a single contractor to provide comprehensive, consistent, and uniform total solutions for CTR logistics support throughout all areas of responsibility ("AORs") and in all operational and physical environments of CTR.  AR 2655, 6346.

The scope of services includes the following: worldwide materials transit (including warehousing and storage), customs clearance in a technical aid environment, procurements, personnel logistics support services, language services support (including interpretation and document translation), contingency response support, and an Online Workflow Management System ("OWMS").  AR 4564, 6346.

The contract is to be an Indefinite Delivery/Indefinite Quantity (IDIQ) single award contract with an initial three-year term with renewal options to extend the total life of the contract to a five (5) year period, and "is a best value source selection acquisition."  AR 2655.

### B. Solicitation Requirements and the Basis for Evaluation

The Solicitation instructed offerors to submit a five-volume package addressing the requirements of the Agency, including one volume for each of the following: Executive Summary, Contract Documentation, Technical, Past Performance, and Cost/Price.  AR 2644-54. The Solicitation informed the offerors:

> It is a best value source selection acquisition conducted in accordance with the FAR and DFARS. The Government will select the best overall offer based on a comparative assessment of the proposals against all source selection criteria: Technical, Past Performance, and Cost.

2

> In making the best value decision, the SSA will consider the following order of importance:
>
> Factor 1—Technical is of equal importance to Factor 2—Past Performance. All Factor 1—Technical subfactors are equal. Factor 1—Technical and Factor 2—Past Performance, individually, are more important than Factor 3—Cost.
>
> In compliance with FAR 15.304(e), when combined, all other evaluation factors (Factors 1 and 2) are significantly more important than Factor 3—Cost. However, the Government's evaluation team will carefully consider Factor 3—Cost in the selection decision.

AR 2655. The Solicitation further states "[i]nformation required for proposal evaluation that is not found in its designated volume will be assumed to have been omitted from the proposal. Each volume shall be written on a stand-alone basis such that its contents may be evaluated without cross-referencing to other volumes of the proposal." AR 2644.

    1. **The Technical Factor**

Regarding the Technical Factor, the Solicitation states the "Government will provide ratings on the Factor 1—Technical sub-factors 'Methodology 2: Combined Technical/Risk Rating Method' from the DoD Source Selection Procedures," which includes consideration of "risk in conjunction with the significant strengths, strengths, weaknesses, significant weaknesses, uncertainties, and deficiencies" in an offeror's submission. AR 2656. The Solicitation provided the evaluation team with the following table to use pursuant to the combined method:

| TABLE 3—COMBINED TECHNICAL/RISK RATING METHOD | | |
|---|---|---|
| **COLOR RATING** | **ADJECTIVAL RATING** | **DESCRIPTION** |
| BLUE | OUTSTANDING | Proposal demonstrates an exceptional approach and understanding of the requirements and contains multiple strengths, and/or at least one significant strength, and risk of unsuccessful performance is low. |
| PURPLE | GOOD | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength or significant strength, and risk of unsuccessful performance is low to moderate. |
| GREEN | ACCEPTABLE | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| YELLOW | MARGINAL | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| RED | UNACCEPTABLE | Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies and is unawardable, and/or risk of performance is unacceptably high. |

*Id.*

Within the technical evaluation, the Solicitation includes Mission Capability and Management Approach sub-factors. For the Mission Capability evaluation, this required the evaluation of:

a)[t]he degree to which the Offeror presents a clear understanding and an innovative approach to fulfill all the objectives outlined in the [Performance Work Statement] PWS,

b) [t]he soundness and effectiveness of the Offeror's approach to fulfill all the objectives of Sample Task, [and]

c) [t]he degree to which the Offeror's performance plan meets the objectives outlined in the PWS and Sample Task.

AR 2657-58.

The Management Approach sub-factor includes evaluation of the a) soundness of the Offeror's approach for overall team management, business practices, and organizational structure required to properly and effectively administer the PWS and Sample Task, b) the effectiveness of the processes to manage cost, schedule, and performance, and c) Transition Planning: Specific plan to fulfill PWS requirements while transitioning from the current TRLS I contract to the new TRLS II contract, and the approach to include participation by small businesses.  AR 2658.

## 2.  The Past Performance Factor

The Solicitation explained that offerors would be evaluated under the Past Performance Factor pursuant to the following table:

| TABLE 5—PERFORMANCE CONFIDENCE ASSESSMENTS RATING METHOD | |
|---|---|
| ADJECTIVAL RATING | DESCRIPTION |
| SUBSTANTIAL CONFIDENCE | Based on the Offeror's recent/relevant performance record, the Government has a high expectation the Offeror can successfully perform the required effort. |
| SATISFACTORY CONFIDENCE | Based on the Offeror's recent/relevant performance record, the Government has a reasonable expectation the Offeror can successfully perform the required effort. |
| NEUTRAL CONFIDENCE | No recent/relevant performance record is available or the Offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned.  The Offeror may not be evaluated favorably or unfavorably on the factor of past performance. |
| LIMITED CONFIDENCE | Based on the Offeror's recent/relevant performance record, the Government has a low expectation that the Offeror can successfully perform the required effort. |
| NO CONFIDENCE | Based on the Offeror's recent/relevant performance record, the Government has no expectation that the Offeror can successfully perform the required effort. |

AR 2659.

## 3.  The Cost/Price Factor

The Solicitation contained cost reimbursement CLINs and firm fixed price CLINs. AR 2653-4.  The cost reimbursement CLINs were for logistics, materials costs, and travel.

AR 2654. The Solicitation required offerors to price CLINs for "Program Support Labor" (CLINs 0002 and 1002) on a firm-fixed price basis and to price CLINs for the logistics services scope of work (CLINs 0001 and 1001) on a cost-plus-fixed-fee ("CPFF") basis. AR 2654.

The Solicitation explains, in the Cost/Price Factor, the "Government will not rate or score cost but will evaluate each Offeror's cost proposal for completeness, reasonableness, and realism." AR 2660. The Solicitation stated that it would evaluate "reasonableness" using one of the techniques in FAR 15.404 to determine if the offeror's proposed cost and fee "in nature and amount, do not exceed costs potentially incurred by a prudent company in the conduct of competitive business." *Id*. The Agency would evaluate the "realism" of the proposed costs by assessing whether the proposed costs "are realistic for the work performance; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the Offeror's Technical section." AR 2660.

Additionally, the Solicitation identified that the Agency would evaluate the cost proposal for program labor support (CLINs 0002/1002) for price realism. *Id*. Specifically, the Solicitation stated that the Agency would conduct a price realism analysis to "determine whether the proposed PMO price and fixed fully burdened labor rates under CLINs 0002/1002 are so low that they reflect a lack of technical understanding." *Id*. The Agency also retained the discretion to reject a proposal "for offering too low prices." *Id*. The Agency is further tasked here with assessing whether the proposed cost elements are realistic and the Agency may adjust the proposed cost where appropriate to reflect the Government's best estimate of the cost most likely to result from the offeror's proposal resulting in a "Most Probable Cost" to be used in the best value evaluation. *Id*.

### C. The Evaluation Teams and the Two-Phase Process

On July 19, 2023, four offerors submitted initial proposals. *See* AR 2672; AR 3254; AR 3682; AR 3962. The Agency's source selection teams then evaluated these initial proposals. There was a separate evaluation team for each of the three factors discussed above. AR 4565. To this end, the initial evaluation teams were organized as follows:



AR 4565. Following the initial review and evaluation of the proposals, the Agency summarized the evaluations in the following chart:

| | Factor 1: Technical | | Factor 2: Past Performance | Factor 3: Cost/Price | | |
|---|---|---|---|---|---|---|
| | Subfactor A Mission Capability | Subfactor B Management Approach | | IDIQ TO 001 (Proposed & MPC) | Sample Task (Proposed & MPC) | TOTAL (Proposed & MPC) |
| | | | | | | |
| Offeror C – Culmen | Acceptable | Acceptable | Substantial Confidence | $33,615,792 | $437,040 | $34,052,832 |
| | | | | $226,959,659 | $437,040 | $227,396,699 |
| Offeror D – TechTrans Intl | Outstanding | Good | Substantial Confidence | $116,979,807 | $294,518 | $117,274,325 |
| | | | | $189,676,870 | $304,649 | $189,981,519 |

AR 4712.

The Solicitation allowed for the Government to eliminate offerors who no longer had a reasonable chance at receiving the award and to enter into discussions with the offerors determined to be in the competitive range. AR 1679. In accordance with the Solicitation and the evaluations, the Agency excluded Aderas from further competition. The Agency then, on May 1, 2024, invited ARServices, Culmen, and TTI to enter discussions and submit a Final Proposal Revision ("FPR"). AR 4793, 4797, 4802, 4807. The Evaluation Notices ("EN") inviting these three offerors to submit FPRs included information about how the evaluation team had scored them, including identifying strengths and weaknesses, providing each offeror an opportunity to address weaknesses when submitting its FPR. AR 4797-01, 4802-06, 4807-11.

The EN identified several strengths and weaknesses in Culmen's proposal. AR 4803-6. Specifically, the EN Culmen received identified 10 weaknesses in its initial proposal under the Technical Factor. AR 4803-05.

### D. The Final Proposal Revisions and Source Selection Decision

#### 1. Members of the Agency's Evaluation Teams Removed

The composition of the Technical Factor evaluation team changed following an investigation into whether one of the evaluators, Ms. Elizabeth DuFrane, was biased against Culmen. AR 557-58. The Source Selection Evaluation ("SSEB") Board Chair, Michael Skidan, investigated the allegation. After reviewing documents,[1] in a Memorandum dated May 22, 2024, Mr. Skidan determined that the documents "could be used to argue that Ms. DuFrane is biased against Culmen." AR 557. In spite of this, Mr. Skidan found that "the documents themselves do

---

[1] He reviewed emails and a Significant Incident Report ("SIR") against Ms. DuFrane from her time in Jordan.

not indicate actual bias against Culmen" and "during the conduct of the TRLS II initial evaluation, there was no indication of actual bias by Ms. DuFrane." *Id.*

Mr. Skidan also noted that another SSEB member, Mr. Scott Anderson, could be subject to an allegation of bias due to his intimate knowledge of the issues and limits with Culmen's proprietary information management system. *Id.* Nevertheless, Mr. Skidan determined that Mr. Anderson's criticisms of Culmen's system were professional and raised only to improve the system. *Id.* The investigation of Mr. Anderson revealed that "there has been no indication that Mr. Anderson is biased against Culmen, and there is no known documentary evidence that could be used to argue bias." *Id.*

Although Mr. Skidan found no evidence of bias against Culmen, he determined that "it is prudent to exercise an abundance of caution and remove [Ms. DuFrane] from the TRLS II SSEB, as well as to commit to a new evaluation of all submitted final proposals." AR 558. Mr. Skidan noted that "Ms. DuFrane's removal is not punitive, is not an adverse administrative action, and has no bearing on her performance." *Id.* She was thereafter removed prior to the submission and evaluation of the offerors' final revised proposals. *Id.* As for Mr. Anderson, Mr. Skidan determined that he could continue serving on the SSEB as a non-voting member. *Id.*

### 2. The Agency's Final Evaluation Teams

The Agency's final evaluation teams were thus comprised as follows:



AR 6206.

### 3. The Award

ARServices, Culmen, and TTI submitted their FPRs. AR 4818, 5260, 524. The Source Selection Authority ("SSA") selected TTI as the winner of the TRLS II Contract. The SSA concluded that TTI's proposal "provides the best overall value to satisfy the requirements of the TRLS II Request for Proposal (RFP) in support of the Cooperative Threat Reduction Program (CTR) mission." AR 6372. To support this conclusion in its Decision Document, the SSA summarized the evaluation scores of the three FRPs under the three factors as follows:

| | Factor 1: Technical | | Factor 2: Past Performance | Factor 3: Cost/Price IDIQ TO 001 (Proposed & MPC) |
|---|---|---|---|---|
| | Sub-factor A: Mission Capability | Sub-factor B: Management Approach | | |
| | | | | |
| Culmen | Good | Good | Substantial Confidence | $254,711,530 $262,334,703 |
| TTI | Outstanding | Outstanding | Substantial Confidence | $217,160,173 $237,680,297 |

AR 6374.

Summarizing the evaluations, the SSA concluded that TTI offered the superior solution under Factor 1, was among the most highly rated for Factor 2, and the offered the lowest most probable cost. For these reasons, TTI's proposal was found to represent the best value to the Government. AR 6322.

Relevant to this protest, under the Technical Factor, TTI's proposal was given 16 total strengths, 3 significant strengths, and no weaknesses. AR 6361-62. Culmen received 8 total strengths, 1 weakness, and no significant strength. AR 6359-60.

As a result of Culmen's unsuccessful offer, it received a summary comparing its proposal with TTI's proposal:

| FACTOR | TTI | Culmen |
|---|---|---|
| 1 - TECHNICAL (OVERALL) | | |
| Subfactor A – Mission Capability | Outstanding | Good |
| Subfactor B – Management Approach | Outstanding | Good |
| 2 – PAST PERFORMANCE | SUBSTANTIAL CONFIDENCE | SUBSTANTIAL CONFIDENCE |
| 3 – COST | | |
| Complete | Yes | Yes |
| Reasonable | Yes | Yes |
| Realistic | Yes | Yes |
| Total Evaluated Cost | $237,680,297 | $262,334,703 |

AR 6584.

## II.    Standard of Review

The Court of Federal Claims possesses jurisdiction to entertain bid protests pursuant to the Tucker Act, 28 U.S.C. §1491(b)(1). 28 U.S.C. § 1491(b)(4) requires that the Court "review the agency's decision pursuant to the standards set forth in section 706 of title 5" of the Administrative Procedure Act (APA). *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). Thus, in a bid protest, applying the APA standard of review, the Court must determine whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4); *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Under this standard a court "must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors." *PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010) (internal quotation marks and citation omitted). The APA does not permit the court to undertake a *de novo* review of the agency's procurement decision. *Axiom Resource Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009).

To prevail in a bid protest, a plaintiff must demonstrate: 1) that the procurement decision "lacked a rational basis"; or 2) "a clear and prejudicial violation of applicable statutes or regulations." *Impresa*, 238 F.3d at 1332-33 (citations omitted). "When a challenge is brought on the first ground, the test is 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the [protestor] . . . bears a heavy burden of showing that the award decision had no rational basis.'" *Banknote*, 365 F.3d at 1351 (quoting *Impresa*, 238 F.3d at 1332-33); *accord Axiom*, 564 F.3d at 1381. The rational basis standard requires the agency's decision to have "considered the relevant factors" and to be "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). When a protestor challenges a decision as arbitrary and capricious, the Court is "highly deferential" to the agency's action. *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000). "The court must especially defer to the agency's technical evaluations, past performance ratings, and other 'minutiae of the procurement process . . . which involve discretionary determinations of procurement officials.'" *J.C.N. Const., Inc. v. United States*, 107 Fed. Cl. 503, 510 (2012) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)). When the Court finds a reasonable basis for an agency's action, it "stay[s] its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989); *see also Bowman Transp., Inc., v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 285-86 (1974).

Indeed, because "contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process, [] procurement decisions are subject to a highly deferential rational basis review." *Id.* (quotation marks and citations omitted). To prevail in a bid protest, "a protestor must show a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020).

And, when a contract is to be awarded on a "best value" basis, as it is here, contracting officers have "even greater discretion than if the contract were to have been awarded on the basis

of cost alone." *Galen Medical Associates, Inc. v. United States*, 369 F.3d 1324, 1330 (2004) (citing *E.W. Bliss*, 77 F.3d at 449) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.").

### III.    Discussion

In this protest, Culmen argues that the Agency's evaluation and award decision were arbitrary and irrational. First, Culmen argues that the Agency's evaluation of TTI's technical approach should not have resulted in an Outstanding Rating. Second, Culmen asserts that the Agency failed to evaluate TTI's Past Performance according to the Solicitation. Third, Culmen argues that the Agency misevaluated its proposal. Fourth, the Agency's actions were arbitrary in failing to reevaluate the proposals despite removing two members of the evaluation team for bias. Fifth, and finally, Culmen argues that for these reasons, it is entitled to a permanent injunction. The Court will take each argument in turn.

### A.   The Agency's Evaluation of TTI's Technical Approach was Rational

Culmen argues that TTI should not have been given an Outstanding technical rating. In support, Culmen argues that the Agency's evaluation of TTI's technical proposal is inconsistent with the administrative record because when the Agency found that TTI's proposed labor costs were too low, the Agency should have accounted for the unrealistic labor costs by determining whether there was risk under the Technical Factor. Simply put, Culmen argues that because the team performing a cost realism evaluation under Factor 3, for cost/price, concluded that the line item for labor in TTI's proposal was too low, the separate team evaluating Factor 1, the technical approach, erred in giving TTI's technical proposal an Outstanding rating.

Turning to the Solicitation, it is clear that the technical and cost/price proposals of each offeror were separate and were to be evaluated separately. Consistent with the solicitation, staffing and labor hours were only included in and evaluated under Factor 3 – cost/price; they were not part of the evaluation of the offerors' technical proposals. *See* AR 2648-50; AR 2652; AR 2656-60 (Section M.3).

Culmen cites to AR 2660 in its reply claiming that this page of the Solicitation mandates that risk be considered. The Solicitation, however, is silent on that page regarding risk. The Solicitation simply states that the agency *"may"* conduct a price realism determination if the price and burdened rates "are so low that they reflect a lack of technical understanding." *Id.* (emphasis added). Further, the Solicitation provides that if an offeror's "proposal is determined to be unrealistic, that proposal *may* be rejected for offering too low prices." *Id.* (emphasis added). Nothing on this page mandates the rejection of TTI's proposal or that the agency go back and reevaluate another separate proposal section—the technical section—based on the alleged risk posed by an estimate for labor hours that the agency deemed low. Reexamining the technical evaluations after the separate cost realism analysis—which Culmen claims should have been done—would have been inconsistent with the terms of the Solicitation.

Yet, the Solicitation did require consistent approaches between Volume V– Cost/Price and Volume III – Technical. Specifically, the Solicitation indicated that in Volume V "[t]he Offeror shall provide a cost proposal for the [work statement] that is consistent with the approaches provided in the Volume III – Technical." AR 2652. And in order to ensure consistency, the record shows that the cost realism analysis was assisted by a member of the technical evaluation team. The Solicitation, however, did not permit the cost realism analysis to inform or affect the evaluation of the Technical Factor. The Solicitation clearly split up the evaluation factors advising that each volume be dedicated to its particular factor as well as indicating that there would be no cross-referencing between the volumes during the evaluation. It would have therefore been inconsistent with the Solicitation to carry cost information from Volume V and apply it to Volume III. By keeping the evaluation of these different factors separate, the Agency ensured independent analysis of each factor.

Further, under the Technical Factor the Agency correctly applied the combined technical/risk rating methodology as required by the Solicitation. *See* AR 2656. Under this methodology, offerors would be rated between Outstanding and Unacceptable based on the presence of strengths and/or significant strengths in their proposal, as well as the risk of unsuccessful performance presented by the proposal. *Id.* The Solicitation provided that risk ratings would range from Low to Unacceptable based on any weaknesses and/or significant weaknesses in the proposal. AR 2657. Based on the terms of the Solicitation, an Outstanding rating would be assigned for a technical approach that "contains multiple strengths, and/or at least one significant strength, and risk of unsuccessful performance is low." AR 2656. A proposal presented a low risk of unsuccessful performance where the proposal "may contain weakness/weaknesses, which have low potential to cause disruption of schedule, increased cost, or degradation of performance." AR 2657.

Applying these evaluation criteria to TTI's technical evaluation, the Agency assigned TTI Outstanding ratings under the Mission Capability and Management Approach subfactors. *See* AR 6846. TTI received 16 total strengths, 3 significant strengths, and no weaknesses under the technical factor whereas Culmen received 8 total strengths, 1 weakness, and no significant strengths. *Cf.* AR 6361-62, 6359-60.

In determining these scores, under the Mission Capability subfactor, the SSEB narrative as it relates to TTI states in part:

> The Offeror's FPR includes ten (10) Strengths and three (3) Significant Strengths that reflect an exceptional and innovative approach to meeting the requirements of the PWS. A Significant Strength was given for proposing a combination of six (6) innovative OWMS features that will provide considerable advantage to the Government by providing time efficiencies for searches; faster service request reviews and approvals; proactive solicitation for support feedback; and optimized system performance that will decrease the time needed to address various issues individually. . . . The Offeror's Strengths included numerous features which provided a considerable advantage to the Government.

AR 6362-63.  Describing why TTI was awarded an outstanding rating under the Management subfactor, the narrative states in part:

> The Offeror's solutions included several *Strengths* due to the robust and innovative approaches proposed for Team Management that will bring considerable advantages to the Government       The Offeror's *Strengths* for Subfactor: B Management Approach and lack of *Weaknesses* demonstrate a very high degree of merit, especially in the Team Management and Transition sections of Subfactor B, resulting in high confidence the proposed overall Management Approach has a low potential to cause disruption of schedule, increased cost, or degradation of performance during and after transition. The Offeror's proposal, therefore, received a rating of Outstanding (Blue) for Subfactor B: Management Approach.

AR 6363-64 (emphasis in the original).

In comparison, Culmen only earned 8 strengths and 1 weakness, and more importantly only earned a rating of good under the Technical Factor.  AR 6360-61.  Given the large discrepancy in the technical evaluations of TTI and Culmen, even if TTI were given a weakness in connection with the low labor hours estimated for some of the work, TTI would have still had far more strengths and significant strengths as compared to Culmen. Thus, if the Agency had assigned a weakness to TTI's technical proposal because the Agency had concluded the labor hours set forth in the cost/price proposal were too low, the record depicts that TTI would still have had a superior technical evaluation compared to Culmen, including twice as many strengths as Culmen.

Additionally, Culmen argues that because the Agency made adjustment to TTI's proposed labor costs pursuant to the Agency's cost realism analysis, Culmen claims the Agency could not have rationally concluded that TTI's proposed price was realistic and the Agency should have considered rejecting TTI's entire proposal.  However, the record reveals that after evaluating the proposed costs of each offeror, the Agency concluded *each* offeror's proposed costs and total price were too low.  AR 6306 (emphasis added). The Agency was thus unable to determine if Culmen or the other offerors' "prices [were] fair and reasonable," which is why the cost team performed its cost realism analysis and determined a most probable cost.  *Id*.  It was only after making adjustments to the cost line items of every offeror, that the Agency was able to conclude that the proposed prices of Culmen and TTI were realistic.  AR 6316.

The record, however, shows that the Agency adjusted the labor costs under CLINs 0002/1002, which are firm fixed prices, and should not have been adjusted.  While the Agency should not have adjusted the proposed costs for labor in TTI's proposal given that it was a firm fixed price CLIN, this adjustment did not harm Culmen.  The adjustment merely raised TTI's evaluated price, which was still below Culmen's following the adjustment.  AR 6374.  In other words, the adjustment reduced the gap in price between Culmen and TTI, thus giving Culmen a better chance of being awarded the contract.

The Agency's conclusion that TTI provided the superior technical proposal compared to Culmen was therefore rational.  Thus, because the Agency assigned TTI's technical subfactors

Outstanding ratings based on the terms of the Solicitation, and the "potential risk" identified in TTI's cost/price evaluation was consistent with a low-risk rating, Culmen's argument is nothing more than mere disagreement with the Agency's decision which is insufficient to overturn the Agency's determination and final award.

**B. The Agency Rationally Assigned TTI a Past Performance Rating of "Substantial Confidence" Consistent with the Solicitation.**

Culmen contends that the Agency's past performance evaluation departed from the Solicitation's required evaluation scheme. Specifically, Culmen asserts that the Agency's past performance evaluation was unreasonable due to "agglomerat[ing]" and "mash[ing] TTI's references together," which led to the Agency assessing higher relevancy ratings to TTI's past performance references than were merited. ECF No. 34 at 24. According to Culmen, the Substantial Confidence rating the Agency assigned TTI was unreasonable because "[n]one of the past performance references submitted by TTI cover all the PWS's areas of work." *Id.* at 26. In particular, the Agency's evaluation of TTI's past performance was arbitrary because the Agency did not evaluate whether each of TTI's references separately demonstrated experience with each of the PWS's objectives but instead combined the individual relevancies of each reference to make "a false relevancy determination." *Id.* at 24.

 "The assignment of a past performance rating is reviewed 'only to ensure that it was reasonable and consistent with the stated evaluation criteria and applicable statutes and regulations, since determining the relative merits of the offerors' past performance is primarily a matter within the contracting agency's discretion." *Todd Constr., L.P. v. United States*, 88 Fed. Cl. 235, 247 (2009), *aff'd,* 656 F.3d 1306 (Fed. Cir. 2011). And "[w]hen the Court considers a bid protest challenge to a past performance evaluation conducted in the course of a negotiated procurement, 'the greatest deference possible is given to the agency.'" *FirstLine Transp. Sec., Inc. v. United States*, 100 Fed. Cl. 359, 396 (2011). "An offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably." *AM Gen., LLC v. United States*, 115 Fed. Cl. 653, 692 (2014) (quoting *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003)).

Here, the Solicitation required offerors to "explain aspects of previous contracts that the Offeror deems relevant to the proposed effort." AR 2651. The Agency was then tasked with evaluating whether these aspects "demonstrated recent and relevant record of performance in providing the services required to meet the PWS objectives." AR 2658. The Solicitation further provided that "[f]or scope, each reference will be compared to the breadth and depth of the PWS objectives." *Id.* Relevancy was based on a reference involving the same or similar "scope and magnitude of effort and complexities this solicitation requires." AR 2659. In addition, the Solicitation requires the awarded contractor to meet seven distinct performance objectives. [2] As

---

[2] Six experiences against which each reference was to be evaluated, i.e., global materials transit, customs clearance in a technical aid environment, procurement, personnel travel logistics, language services, and the OWMS align with the PWS objectives of the TRLS II contract. *See* AR 6353; AR 1478-1511 (describing each PWS in detail). The one PWS objective not

not identify a plan to meet the other replenishment requirements identified in the Sample Task," such as the one-time replenishment and the goods that need to be replenished every two months. AR 6240. And although Culmen argues that the evaluation team should have assumed replenishment would occur despite not being proposed, such assumption is unreasonable based on the language of the Solicitation. The weakness given to Culmen was thus appropriate.

Likewise, the record does not support Culmen's argument that it was treated differently than TTI regarding the sample task's replenishment requirements. TTI addressed the replenishment needs as set forth in the sample task explaining that it would consolidate replenishment items "into a single shipment" "to provide best value and economy of lift" so the recipient would have the requisite supplies for the duration of the project as set out in the sample task. AR 5765. Unlike Culmen who proposed to address the replenishment requirement by ███████████████████, TTI proposed to completely eliminate the need for separate replenishments by shipping the initial and replenishment quantities together. *Compare id. with* AR 5339. Thus, because the difference in the Agency's evaluation of Culmen's and TTI's replenishment plans can be directly traced to a difference in the plans, Culmen's unequal treatment argument fails. *See AccelGov, LLC v. United States*, 164 Fed. Cl. 345, 362 (quoting *Off. Design Grp. v. United States,* 951 F.3d 1366, 1372 (Fed. Cir. 2020)) ("To prevail on a claim of disparate evaluation, a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' from or 'nearly identical' to those contained in other proposals. . . . If a protestor does not meet this threshold showing, then the court should dismiss the claim, otherwise it 'would give a court free reign to second-guess the agency's discretionary determinations underlying its technical ratings.'").

And finally, Culmen argues that the Agency improperly adjusted its proposed travel costs upwards as part of its cost-realism analysis. Culmen argues that the Agency's evaluation of the costs was based on a misinterpretation of its proposal. In its proposal, Culmen provided:

> Ground transport is highly variable based on several factors. Distance between the locations, time of day, time of year, type of transport (bus, taxi, shuttle, train, etc.), and other local factors will affect the individual cost of transport. For our estimate of ground transport, we ████████████████████████████████████████████████ ██████████████████████████████████████████████████ █.

AR 5513. Turning to the Agency's evaluation, the Agency determined:

> Culmen's total proposed price for ground transportation for conference events, ███████, is ███████ than the IGCE[3]; the variance is significant. The variance is a result of the calculations used in the IGCE included ground transportation costs based on an 8-hour day usage for multiple trips throughout the day, whereas the proposed ████████████████████████.

---

[3] Independent Government Cost Estimate.

AR 6650. This determination, according to Culmen, does not align with its proposal. Culmen suggests that the interpretation is based on the misinterpretation of the following line in its proposal: "For our estimate, . . . we used ███████████████████." AR at 5513 (emphasis in original); *see* ECF No. 34 at 31. According to Culmen, this reference to "██████" does not mean that Culmen factored ground transportation for only ██████ but "elaborates that Culmen based its estimate for ground transportation on its '██████' and included an assumption of ██████ on top of that information." *Id.*

However, the explanation Culmen now proffers for the reference to "████" is not reflected in its proposal. Indeed, in its proposal, Culmen failed to include sufficient details of its travel plans "for effective evaluation" and substantiation of the validity of those proposed travel costs especially given the significant variance between Culmen's proposed travel costs and the IGCE. Thus, the Agency's adjusted upward travel costs to a level that reflected the most probable cost during performance was rational.

## D. The Agency Acted Reasonably in Addressing Potential Conflicts of Interests Amongst SSEB Members

Culmen challenges the Agency's investigation and resolution of Culmen's allegations of bias against an SSEB member. *See* ECF No. 34 at 32-36. According to Culmen, the "Agency failed to perform a reasonable analysis to address and remediate any impact upon the procurement." *Id.* at 34. Thus, Culmen claims the Agency's handling of the situation was flawed, arbitrary, capricious, and an abuse of discretion.

"The standard for Claims Court review of a contracting officer's decision with regard to a conflict of interest is highly deferential. A contracting officer's conflict of interest determination will be upheld unless it is 'arbitrary, capricious, or otherwise contrary to law.'" *Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1296 (Fed. Cir. 2020) (quoting *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010); *see also Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1380 (Fed. Cir. 2024). Furthermore, the Court must "assume that the government acts in good faith while contracting and a protester needs 'well-nigh irrefragable proof' that the government had an intent to injure it to overcome this presumption." *Galen Medical Associates, Inc. v. United States*, 56 Fed. Cl. 104, 108 (2003) (quoting *Knotts v. United States*, 121 F. Supp. 630 (Ct. Cl. 1954); *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002).

In May of 2024, after the evaluation of the offerors' initial proposals, "the attorney supporting the TRLS II procurement provided Mr. Michael Skidan, [the Source Selection Evaluation Board (SSEB) Chair,] a series of documents for consideration . . . [of whether Ms. Elizabeth] DuFrane or any other member of the TRLS II SSEB might have actual or perceived bias against any TRLS II offeror." AR 557. Following investigation and review of the facts, the Chair recommended to Dr. Robert S. Pope, the TRLS II Source Section Authority and SES Director for Cooperative Threat Reduction at the Agency, that Ms. Elizabeth DuFrane be removed from the technical evaluation team and that Mr. Scott Anderson continue to serve as a non-voting member of the team. AR 558.

Mr. Skidan explained and documented the reasoning behind his recommendation in a memorandum. AR 557-58. That memorandum explained the concern that Ms. DuFrane might appear biased against Culmen. *Id.* However, Mr. Skidan concluded that the evidence gathered as to Ms. DuFrane did "not indicate actual bias against Culmen, and . . . there was no indication of actual bias" during the initial TRLS II evaluation. *Id.* Nevertheless, because the evidence "could be used to argue bias," the conservative approach of removing her from the evaluation team was recommended. *Id.*

Mr. Skidan also considered whether Mr. Anderson might appear biased. *Id.* Mr. Skidan considered the fact that "Mr. Anderson regularly used Culmen's proprietary information management system (Mercury)" and had critiqued the system. Mr. Skidan, however, determined that Mr. Anderson's "critiques of Mercury have been professional, relevant, and have only been raised to improve the system. During the TRLS II initial evaluations, there has been no indication that Mr. Anderson is biased against Culmen, and there is no known documentary evidence that could be used to argue bias." *Id.* For these reasons, Mr. Skidan recommended that Mr. Anderson remain as a non-voting member of the evaluation team. *Id.*

Because Ms. DuFrane was removed before submission and review of the final proposals, even if there were evidence of actual bias on the part of Ms. DuFrane, Culmen was not prejudiced. For example, Culmen had a chance to review, address, and resolve the weaknesses in its initial proposal after these evaluators were removed, which it did. *Cf.* AR 557-58, 5260. The record indicates that indeed Culmen did address and cure all but one of the weaknesses in its technical proposal that were identified in the evaluation of its initial proposal. *Cf.* AR 4734-35, 6238-43. In addition, as indicated in his memorandum, Mr. Skidan committed to a new evaluation of all submitted final proposals. AR 558.

The Court finds that there is no evidence that the procurement was adversely impacted by a biased evaluator. The SSEB Chair's handling of the concern about the appearance of bias was rational, documented, and conservative. Culmen's protest ground is nothing more than mere disagreement with the Agency's reasonable investigation and mitigation of Culmen's bias allegations. *See Koam Eng'g Sys., Inc.*, 164 Fed. Cl. at 168 ("Although protestor disagrees with the breadth of the investigation, unless the contracting officer's determinations were arbitrary and capricious, mere disagreement is not sufficient for the court to conclude the investigation was insufficient."). Therefore, the Court finds that it provides no grounds for disturbing the Agency's award decision to TTI.

### E.  Best Value

Finally, Culmen alleges that the Agency's best value determination was arbitrary because it was based on a flawed underlying technical, past performance, and cost evaluation. As this Court has stated, a "derivative best-value challenge cannot stand on a rejected challenge to another aspect of the agency's evaluation." *Newimar S.A. v. United States*, 160 Fed. Cl. 97, 133 (2022), *aff'd*, No. 2022-1949, 2023 WL 8534614 (Fed. Cir. 2023). Accordingly, because the Court finds that the record reflects that the Agency reasonably evaluated Culmen's and TTI's proposals, Culmen's challenge to the Agency's best value determination is without merit. *See*

*AccelGov, LLC v. United States*, 163 Fed. Cl. 43, 56 n.8 (2022) (rejecting derivative best-value tradeoff challenge where the protester had failed to succeed on its evaluation challenges); *IT Enter. Sols. JV, LLC v. United States*, 132 Fed. Cl. 158, 174 (2017) (rejecting derivative challenge to the agency's best value determination because the underlying evaluation was reasonable).

## IV.    Conclusion

Culmen has not established that DTRA's evaluation was conducted in an irrational, arbitrary, or capricious manner, or that DTRA's evaluation was prejudiced. Not having shown success on the merits, this Court need not consider the other injunctive factors. *See Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018) (holding that "proving success on the merits is a necessary element for a permanent injunction"). No relief is warranted. Accordingly, Culmen's Motion for Judgment on the Administrative Record is **DENIED**. The Government's and Intervenor's Cross-Motions for Judgment on the Administrative Record are **GRANTED**. The Clerk of Court is directed to enter judgment accordingly. No costs.

**IT IS SO ORDERED.**

s/Edward J. Damich
EDWARD J. DAMICH
Senior Judge